Argued May 6, affirmed July 22, 1919.

# STATE OF OREGON v. PACIFIC LIVE STOCK CO.

(182 Pac. 828.)

**Equity—Right to Voluntary Nonsuit—Motion Before "Trial."**

1. In view of Sections 45, 46, 102, 105, 109, 113, 114, L. O. L., under Section 182, providing that nonsuit may be given against a plaintiff on his motion at any time before trial unless a counterclaim has been pleaded in defense, made applicable to suits in equity by Section 410, plaintiff may take a voluntary nonsuit after a demurrer has been filed and disposed of; the hearing on demurrer not being a "trial" within the meaning of Section 182, which refers to trial on the merits before a jury.

**Equity—Right to Voluntary Nonsuit—Counterclaim.**

2. In suit by the state to set aside and cancel deeds to state lands on the ground of fraud, affirmative defenses pleaded by defendant, insufficient, considered independent of the original bill, to give defendant ground for affirmative relief, *held* not such a counterclaim as to prevent plaintiff from taking a voluntary nonsuit before trial on the merits under Section 182, L. O. L., made applicable to suits in equity by Section 410.

From Harney: DALTON BIGGS, Judge.

In Banc.

This is a suit brought by the state against the defendant to set aside and cancel the deeds to about fourteen thousand acres of state lands, which had been

conveyed by the state to the defendant, upon the ground of fraud.

The defendant appeared and filed a demurrer to the complaint, upon the ground that it did not "state facts sufficient to constitute a cause of suit," and also upon special grounds stated therein. Thereafter the demurrer was overruled. The defendant then answered with a denial of the essential allegations of plaintiff's complaint, and also pleading certain affirmative defenses, based upon the statute of limitations, and that the defendant was an innocent purchaser, etc., ending with a prayer for the dismissal of the suit, and such other relief as may be meet in the premises.

The case being put at issue, was continued from term to term until about November, 1917, at which time the defendant moved to dismiss the same for want of prosecution. This motion seems to have been undisposed of, and while it was still pending before the court, and on September 11, 1918, the plaintiff came in by the Attorney General, and moved for a dismissal of the cause, without prejudice, and on the same day an order was filed dismissing the cause, from which order the defendant appeals.          AFFIRMED.

For appellant there was a brief with oral arguments by *Mr. Edward F. Treadwell* and *Mr. John L. Rand.*

For the State of Oregon there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, with an oral argument by *Mr. Bailey.*

BENNETT, J.—1. The principal question presented in the case, is as to whether a plaintiff may take a

voluntary nonsuit under the provisions of Section 182, L. O. L., made applicable to suits in equity by Section 410, L. O. L., after a demurrer has been filed and disposed of. The question has been very ably and exhaustively briefed and presented, by the attorneys on each side, and depends entirely upon the construction of the first clause of Section 182, reading as follows:

"A judgment of nonsuit may be given against a plaintiff, as provided in this chapter—on motion of the plaintiff, at any time *before trial,* unless a counterclaim has been pleaded in defense."

It is strenuously and plausibly urged on behalf of defendant that the hearing upon the demurrer and the decision thereon was a "trial" of an issue of law, and therefore terminated the right to a voluntary nonsuit under said clause, and *Hume* v. *Woodruff,* 26 Or. 373 (38 Pac. 191), and *Ferguson* v. *Ingle,* 38 Or. 43 (62 Pac. 760), are cited to support the contention.

The plaintiff, on the other hand, contends that the hearing upon a demurrer is not a "trial" within the meaning of Section 182, where the demurrer is overruled and the defendant answers, thus putting the case at issue; and cites *Hutchings* v. *Royal Bakery,* 60 Or. 48 (118 Pac. 185), to sustain the contention upon its part.

It seems to us the contention of the plaintiff must be sustained. There can be no doubt under our statute but what the hearing upon a demurrer is some sort of a "trial": Section 109, L. O. L. But the word was not used in that sense in Section 182, L. O. L.

Section 113, L. O. L., evidently creates and recognizes two distinct meanings of the word "trial." One is a "trial" of an issue of law, and the other is the "trial of an issue of fact." That these two classes

of trials are entirely distinct and separate things is very clear by reference to the section following: Section 114, L. O. L. They are tried at different times by separate tribunals. An issue of law is tried before the judge, and an issue of fact is ordinarily tried before a jury.

In other words, the word "trial" as defined in the Code covers two distinct and separate proceedings. It is like many other words in the English language, which have different meanings, and are sometimes used with one meaning and sometimes with the other. Certainly, the legislature had some definite period in the litigation in mind when the right to a voluntary nonsuit should be extinguished.

Here, then, were two separate adjudications to which the word trial might apply. One a preliminary trial by the court of an issue of law, and one a trial upon the merits before a jury. The question is, To which of these did the legislature refer in Section 182? This question we must solve by reference to the context, the subject matter, and the meaning with which the same word "trial" is used by the legislature in other sections of the Code.

That the word is used in the sense of a final trial upon the merits in other sections of the Oregon Code is very plain. Section 45 provides that,—

"The court, or judge thereof, may change the place of trial, etc."

Section 46, L. O. L., provides, this motion can only be made after the cause is at issue upon a question of fact. So it is plain that the word "trial" in Section 45, *supra,* had reference only to the trial of a question of fact upon the merits. Section 102, L. O. L., provides:

"The court may, at any time *before trial,* in further-ance of justice, * * allow any proceeding or pleading to be amended by adding the name of a party, etc."

It seems perfectly clear that the words "*before trial*" in that section refer to a trial upon the issues of fact. A like use of the word is again made in Section 105. Indeed, in Section 182, subdivision 3, the word "trial" is used three different times by the legislature, and every time with plain reference to a trial on the merits.

It seems to me, that where we find the same word "trial" is used so frequently in other places in the Code and even in the same section, and always, or even generally, with entire reference to a trial on the merits, we may reasonably assume it uses the word in this instance with that meaning.

In *Warm Springs Irr. Dist.* v. *Pacific Livestock Co.,* 89 Or. 19, 22 (173 Pac. 265), this court had occasion to define the meaning of the word, as used at still another place in the Code, where a provision is made in condemnation proceedings for the fixing of a rea-sonable attorney's fee by the court at the "trial." Mr. Justice BEAN, delivering the opinion of the court, said:

"For various purposes, a hearing on a demurrer is a trial and so is the hearing on the question of at-torney's fee, as suggested by counsel; but does the statute mean such a trial, or does it mean a trial of the subject matter of the action. The subject of the litigation is the damages to the property proposed to be taken. Hearing on demurrer, attorney's fee, mo-tion, or trial is not 'the trial' as to the subject of the litigation, but of matters merely incident to and growing out of the litigation of the subject matter of the action.

"When the lawmakers provided that in such a proceeding a reasonable attorney's fee should be fixed by the court 'at the trial' it is apparent from the examination of the whole section and of all of the provisions for proceedings in condemnation that they had in mind the main or final trial of the cause."

This case was tried *in banc* and the definition of the word "trial," as used in that section, was concurred in by every member of the court.

In *Hume* v. *Woodruff,* 26 Or. 373 (38 Pac. 191), Mr. Justice Bean, delivering the opinion of the court, says:

"An issue of law arises upon a demurrer, * * and, since a defendant may demur upon the ground 'that the complaint does not state facts sufficient to constitute a cause of suit' * * it would *seem* to follow that the determination of an issue presented by such a demurrer, is a trial of the cause within the meaning of the statute * * and, as a consequence, that after the disposition thereof a plaintiff is not entitled to a voluntary nonsuit, unless by leave of the court an amended complaint is filed."

In that case that question was really not before the court, for an amended complaint *had been filed,* and the court held that under the pleadings actually presented, the plaintiff *did* have a right to the voluntary nonsuit.

In *Ferguson* v. *Ingle,* 38 Or. 43 (62 Pac. 760), the condition was exactly the same, and again the cause was reversed because a voluntary nonsuit had been refused after the demurrer had been sustained, and an amended pleading had been filed.

In *Hutchings* v. *Royal Bakery,* 60 Or. 48 (118 Pac. 185), the defendant filed a demurrer, which was overruled, as in this case, and the cause came on for trial before a jury. After the jury had been formed and

several witnesses had testified, the plaintiff moved for a voluntary nonsuit and his motion was allowed. After a very careful consideration of the authorities by Mr. Justice Bean, this action was affirmed.

In that case there was a dissent by Mr. Justice McBride, but as I read the dissenting opinion, it was his judgment also, that the voluntary nonsuit could be taken, up to the time of the commencement of the trial upon the facts. The whole court was apparently unanimous that it did not end with the hearing upon the demurrer, which had been filed and disposed of in that case.

Of course, if the plaintiff could take a voluntary nonsuit at any time *during the trial* on the facts, it follows by stronger reasoning that he could take it at any time before the trial.

It is true this decision was in an action at law, but it seems under Section 404, L. O. L., which makes Section 182 applicable to equity suits, the same reasoning must apply.

The same result seems to have been reached by the entire court in the case of *Currie* v. *Southern Pac. Co.,* 23 Or. 400 (31 Pac. 964), in which the action had been commenced in the Justice's Court. An answer had been filed, and a *demurrer to the answer,* which was sustained in the Justice's Court. The case was appealed to the Circuit Court and there it came up again and the *demurrer was again argued and submitted.* The Circuit Court overruled the demurrer. The plaintiff then filed a reply and the defendant moved to strike out the reply, thus raising still another issue of law. The motion was denied and the defendant then "demurred to the reply," raising a third issue of law. There was a verdict for the plaintiff. The judg-

ment on this verdict was reversed on appeal, on the ground that the court should not have permitted the filing of the reply, and the court remanded the case for a trial upon the issues presented by the complaint and answer: See same case, 21 Or. 566 (28 Pac. 884). When the case got back to the Circuit Court and being then pending upon the issues of fact, and the demurrer to defendant's answer *still standing as overruled* by the court, and there being no amended pleading filed, the plaintiff moved for a voluntary nonsuit. This was allowed and upon a second appeal the Supreme Court held that the motion *was not too late.* Chief Justice LORD, delivering the opinion, said:

"The Code provides that a nonsuit can be taken by the plaintiff at any time before trial, unless a counterclaim has been pleaded as a defense. * * At common law the plaintiff might take a nonsuit, as of right, at any time in the progress of the trial he might prefer, and thereby reserve to himself the power to bring a fresh action for the same subject matter; and this right continued until after the verdict was rendered, but ended with the entry of the judgment. * * Nonsuits are classed under two divisions: (1) Involuntary, as when ordered by the court against the plaintiff's objection; (2) Voluntary, when allowed by the court on the plaintiff's own motion; * * and it has been uniformly held that a voluntary nonsuit will not deprive a plaintiff of his right to try the case a second time, when, with more favorable conditions, he may attain greater success than in the first case. This explains why nonsuits are so frequent. It has been well said that a 'nonsuit is like the blowing out of a candle, which a man at his own pleasure may light again.' * * While there is some difference in the practice of the states, in many it is provided, as in Oregon, that a nonsuit may be taken at any time before the trial. As the case stood, no trial had been had when the nonsuit was asked by the plaintiff and allowed by

the court.  BLACK, J., said that 'there is no case which
decides that the plaintiff may not become nonsuited on
his own motion, or that he may not, if he pleases, dis-
continue or withdraw his action.' * * Since the plain-
tiff had the right to take a nonsuit so as to prevent
an adjudication on the merits, and to enable him to
begin over again if he so desired, no right of the
defendant was denied.''

If *Hume* v. *Woodruff* and *Ferguson* v. *Ingle* are in-
consistent with these opinions, they should be con-
sidered, it seems, as overruled by the latest decision
in *Hutchings* v. *Royal Bakery Co.,* but I think the
point actually decided in the Hume case and in the
Ingles case, and the logic of those decisions, *support*
the Hutchings case, although there is an intimation
by way of *dictum* in the Hume case, which is perhaps,
to the contrary.  But it was actually decided therein
that a voluntary motion for a nonsuit was permissible
*after a demurrer had been filed and passed upon.*
While it is true, an amended pleading in a cause
eliminates the original pleading, yet it could not elimi-
nate *the fact that there had been a trial,* of an issue of
law *in the cause,* and, therefore, if the statute is to be
construed as prohibiting a voluntary nonsuit, unless
it is offered *before a trial upon a demurrer,* the volun-
tary nonsuit would be logically too late, after such an
issue of law had been tried and disposed of in the cause,
without regard to the amendment.

It seems to me also that the fact that the meaning
of the word "trial," as applied to the decision upon
the merits, is one of common use, while the other mean-
ing, as applied to the hearing upon an issue of law,
is technical and unusual, is important in concluding
as to which sense the word was used in, by the legis-
lature.

In ordinary language we speak of a "trial" of the issues of fact, and of a "hearing" on a demurrer.

Bouvier defines trial as,

"The examination before a competent tribunal, according to the laws of the land, of the *facts* put in issue in a cause. * * The examination of the matter of fact in issue in a cause.   The decision of the issue of fact."

As I understand it, the Bar of the state has always in actual practice, recognized and asserted the right of the plaintiff to take a voluntary nonsuit at any time, before the trial on the merits commenced; and it seems to me a decision to the contrary would revolutionize the practice.

In actual practice a general demurrer is filed in nearly every case, in the lower courts.   Sometimes this is done, because the complaint is thought to be really defective; sometimes because an inexperienced attorney wishes to save upon the record, any point which may subsequently develop; and quite often it is intended as an appearance to prevent a default, until the attorney is ready to prepare an answer.   These demurrers are submitted and formally passed upon by the court, either with or without argument.   This occurs at the very commencement of the case.   To hold that the submission of these demurrers and the decision of the court thereon terminates the right to a voluntary nonsuit would be to practically destroy that right altogether and render it entirely worthless to the plaintiff.   It does not seem to me that the legislature could have intended any such result.

It is not necessary in this case to decide what would be the rule as to dismissal if the defendant stood upon his demurrer, or if the demurrer was sustained, and the plaintiff did not amend.   But we hold that where,

in a suit, the defendant has filed a demurrer, which has been overruled, and the defendant has answered, the plaintiff may take a voluntary nonsuit as a matter of course (there being no counterclaim) at any time before the trial of the issues of fact.

The only other question presented in the case is whether or not the defendant had pleaded such a counterclaim, as would prevent the plaintiff from a voluntary dismissal of the case.

2. The only affirmative defenses pleaded are in the nature of laches, estoppel and adverse possession. There is no setting up or pleading of a cloud upon the title, or an adverse claim by the plaintiff. In that regard, if the defendant sought to take advantage of any such adverse claim, he would have to depend upon the allegations of plaintiff's complaint and not upon the allegations of his own pleading.

Neither was there any prayer to have any claim upon the part of the plaintiff adjudicated, or for any claim of affirmative relief of any character, unless that should be implied from the general equity prayer.

While the affirmative defenses set forth in defendant's pleading might perhaps be sufficient as a defense, yet they were not sufficient considered independently of the original bill, to give the defendant ground for affirmative relief.

A counterclaim in an equity suit under our practice is much in the nature of a cross-bill under the old equity practice, and in such a bill the defendant could not rely upon the allegations in the original complaint.

"A cross-bill must be as complete and perfect as an original bill, and must be good within itself, not relying upon reference to the original bill for any of its essential averments": 16 Cyc. 330, § F.

So, under our practice, it is said in *Le Clare* v. *Thibault*, 41 Or. 601, 608 (69 Pac. 552):

"An answer setting up a counterclaim must contain the substantial requisites of a complaint, and allege facts which legally entitle the defendant to recover in a suit instituted by him for that purpose against the plaintiff; and, if his pleading omits any allegation that would be necessary to state a cause of suit, it will be vulnerable to a demurrer interposed on that ground."

In *Templeton* v. *Cook*, 69 Or. 313, 317 (138 Pac. 230), it is said:

"A counterclaim permissible in an equity case shall be one upon which a suit might be maintained by the defendant against the plaintiff in the suit."

In *Maffett* v. *Thompson*, 32 Or. 546, 551 (52 Pac. 565, 53 Pac. 854), it is said:

"In so far as it was designed to afford affirmative relief, the counterclaim here provided for takes the place of the cross-bill under the chancery practice, as it formerly prevailed. * * Under that practice, which still obtains in many jurisdictions, if the cross-bill sets up matters purely defensive, and prays for no affirmative relief, a dismissal of the original bill necessarily disposes of the cross-bill also."

In *Dove* v. *Hayden*, 5 Or. 500, the question here presented was directly before the court, and the court said:

"The substantial question presented by the motion to dismiss, is, whether any counterclaim to the plaintiff's cause of suit, is set up in the answer. Unless the facts there alleged constitute a counterclaim, the judgment of nonsuit on the motion of plaintiff was properly granted. * * The counterclaim, therefore, which the defendant is authorized to interpose, must be one upon which a suit might be maintained by the defendant against the plaintiff in the suit."

In *Chance* v. *Carter,* 81 Or. 229, 239 (158 Pac. 947), it is said by Mr. Justice HARRIS:

"Furthermore, while the answer pleads enough to conform to a special provision of the statute applicable to actions in ejectment, nevertheless the pleading does not, strictly speaking, set forth a cause of action, because, if the new matter stood alone, it would not contain all the elements necessary for a cause of action; nor would the new matter in the pleading by itself be a complete statement of a cause of suit. Repeated decisions have declared that a counterclaim must be complete in itself, and state facts which show that the defendant is entitled to recover from the plaintiff if an action had been instituted for that purpose."

Here, upon an inspection of the answer, it will be noticed, there is no affirmative allegation whatever, that the State of Oregon *was asserting or making any claim to the land in question,* or that any such claim was in any way a cloud upon defendant's title. Is it not perfectly plain that if the defendant was attempting to ask affirmative relief, upon a complaint of its own, in a suit brought independently by it, it would have no cause of suit whatsoever, without such an allegation?

Then when we apply the doctrine presented by Mr. Justice HARRIS in the Carter case, and so universally established, that a counterclaim, like a cross-bill, must contain every essential element of the defendant's right to recover, which is necessary in an independent suit. Is it not entirely clear that there was no counterclaim pleaded, and indeed no intention to plead a counterclaim, even if the answer had been in other respects entirely sufficient? In this regard the absence of a prayer for the quieting of title, or the settling of any adverse claim, is significant. Probably such a prayer would not always be necessary if all the

other requisites of a good bill in equity were present; but the absence of such a prayer is strong evidence that there was no intention to plead a counterclaim, and, as it seems to me, a sufficient counterclaim was in fact not pleaded.

In passing upon the case we have not considered the question of whether or not the defendant could maintain any claim for affirmative relief against the state, if the pleadings in that regard were otherwise sufficient. As to this, there is at least very grave doubt, as shown in the opinion of Mr. Justice HARRIS, but to my mind it is so clear that there was no counterclaim pleaded, a decision upon the other question seems unnecessary.

It is urged that the dismissal of this case works a hardship upon the defendant, since it leaves an uncertainty in regard to the title to all of that large tract of land included in the first complaint and not included in the second. We hardly see how the condition of the defendant, in that regard, can be any worse than it would have been if the original suit had not been brought in the first place. The embarrassment, if any, seems to arise from the fact that the defendant cannot, under our Constitution and laws, bring an independent suit against the state to adjudicate its title. But this is a matter for the legislative power of the state, with which we cannot interfere.

The judgment of the court below should be affirmed.

AFFIRMED.

HARRIS, J.—I concur in the conclusion reached by Mr. Justice BENNETT; but I base my conclusion upon different grounds.

On April 10, 1914, the State of Oregon commenced this suit against the Pacific Live Stock Company for

93 Or.—14

the avowed purpose of bringing about a cancellation
of deeds covering about 26,000 acres of land, claiming
that the land had been fraudulently acquired by "dum-
mies." On May 2, 1914, the defendant demurred
to the complaint; and subsequently on December 31,
1914, the court overruled the demurrer. Afterwards,
on February 5, 1915, the defendant filed an answer
which, besides admissions and denials, affirmatively
alleged that the plaintiff had been guilty of laches,
that the defendant was a *bona fide* purchaser for
value, and that the defendant was and had been in
adverse possession for more than ten years. The
answer concluded with a prayer for costs and for
"such other relief as may be meet in the premises."
On June 7, 1915, the state filed a reply containing
admissions, denials and affirmative allegations, thus
completing the issues.

On September 11, 1918, the state moved for a dis-
missal of this suit "without prejudice" on the alleged
ground that state officials had recently discovered
that "much of the land involved in the case was ac-
quired by forging real and fictitious persons' signa-
tures to the applications and deeds, and the complaint
filed" in 1914 was not in the opinion of counsel for the
state "broad enough to permit the introduction of
evidence of such character and, therefore, it became
necessary either to amend said complaint or to file a
new complaint, and in order to prevent delay of filing
a motion for permission to file an amended complaint,
it was deemed advisable to dismiss the present suit
and start a new suit." The motion was allowed by the
court and the suit was "dismissed without prejudice";
and subsequently the state began another suit attack-
ing the deeds to about 19,000 acres of the 26,000. In
other words, this the first suit attacks the paper title

to 26,000 acres of land; while the second suit attacks the paper title to 19,000 acres and makes no mention of the remaining 7,000 acres of land. The defendant moved to set aside the order of dismissal, and, when the Circuit Court overruled the motion, the defendant appealed.

It is vigorously contended that the Circuit Court was without lawful authority to dismiss the suit "without prejudice" because: (1) there had been a trial; and (2) the defendant had pleaded a counterclaim in its answer. This contention is based upon certain sections of the Code. Section 182, subdivision 1, L. O. L., provides that a judgment of nonsuit may be given against the plaintiff "on motion of the plaintiff, at any time before trial, unless a counterclaim has been pleaded as a defense." Section 410, L. O. L., declares that a decree dismissing a suit may be given against the plaintiff in the case specified in Section 182, subdivision 1; and "such decree is a determination of the suit, but shall not have the effect to bar another suit for the same cause, or any part thereof." Relying upon the holdings in *Hume* v. *Woodruff,* 26 Or. 373 (38 Pac. 191), and *Ferguson* v. *Ingle,* 38 Or. 43 (62 Pac. 760), the defendant argues that the ruling upon the demurrer was a trial within the meaning of Section 182, L. O. L., and within the meaning of the term "trial" as it is expressly defined in Section 113, L. O. L. In the opinion of the writer the state cannot, because of its status as a sovereign, be compelled to continue the litigation against its will; and consequently it is utterly immaterial whether the decision upon the demurrer was or was not a trial within the meaning of Sections 182 and 410, L. O. L., and it is likewise immaterial whether the answer does or does

not contain a counterclaim within the meaning of Section 182, subdivision 1, L. O. L.

The State of Oregon is a sovereign and because of that fact cannot be sued in its own courts without its consent. Indeed, the state can withdraw its consent after it has once given it: *State ex rel.* v. *Jumel,* 38 La. Ann. 337, 339. So puissant is the state and so completely immune from attack in its own courts is the sovereign state that it can withdraw its consent and by that act alone terminate a pending suit against it although such suit was originally begun with the express consent of the state. This doctrine finds concrete illustration in *Beers* v. *State of Arkansas,* 20 How. 527 (15 L. Ed. 991). An action was brought in a Circuit Court of the State of Arkansas to recover the interest due on certain bonds issued by the state. The state Constitution empowered the legislature to provide by law ''in what courts and in what manner suits may be commenced against the state.'' In pursuance of that provision of the Constitution a law was passed permitting the prosecution of suits against the state. Acting upon the faith of that law the action was begun in the Circuit Court on November 21, 1854; but afterwards on December 7, 1854, while the action was still pending in the Circuit Court, the legislature passed a statute providing that in all suits brought to enforce the collection of any bonds issued by the state such bonds should be filed in the office of the clerk and upon failure to file the bonds at a designated time the court was required to dismiss the suit. The holder of the bonds involved in the suit against the State of Arkansas refused to file them and thereupon the suit was dismissed. In the course of its opinion the Supreme Court of the United States used this language:

"It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission; but it may, if it thinks proper, waive this privilege, and permit itself to be made a defendant in a suit by individuals, or by another State. And as this permission is altogether voluntary on the part of the sovereignty, it follows that it may prescribe the terms and conditions on which it consents to be sued, and the manner in which the suit shall be conducted, and may withdraw its consent whenever it may suppose that justice to the public requires it."

Again, in the same opinion the court said:

"Nor can this court inquire whether the law operated hardly or unjustly upon the parties whose suits were then pending. That was a question for the consideration of the legislature. They might have repealed the prior law altogether, and put an end to the jurisdiction of their courts in suits against the state, if they had thought proper to do so, or prescribe new conditions upon which the suits might still be allowed to proceed."

The broad doctrines announced in *Beers* v. *Arkansas* are recognized and followed in *State* v. *Bank of Tennessee*, 62 Tenn. (3 Baxt.) 395, 399, 406.

The Code provides that in addition to denials the answer may contain "a statement of any new matter constituting a defense or counterclaim" (Section 73, L. O. L.); and the Code also states that—

"The counterclaim mentioned in Section 73 must be one existing in favor of a defendant, and against a plaintiff, between whom a several judgment might be had in the action * * ": Section 74, L. O. L.; Section 395, L. O. L.

In section 401, L. O. L., we read:

"The counterclaim of the defendant shall be one upon which a suit might be maintained by the defendant against the plaintiff in the suit."

A counterclaim in equity must be connected with the subject of the suit and contain such an averment of facts as to authorize the defendant to maintain a suit thereon against the plaintiff: *Le Clare* v. *Thibault,* 41 Or. 601, 606 (69 Pac. 552); *Templeton* v. *Cook,* 69 Or. 313, 317 (138 Pac. 230). Affirmative matter pleaded in an answer may be either defensive or offensive or both defensive and offensive: *Griffin* v. *Jorgenson,* 22 Minn. 92, 95; *Haaland* v. *Miller,* 67 Or. 346, 350 (136 Pac. 9). If the answer is defensive only and does not ask for affirmative relief a dismissal of the complaint carries with it the answer and suit; but if the answer contains a counterclaim within the meaning of the Code a dismissal of the complaint, as distinguished from a dismissal of the suit, does not carry the answer with it, for the reason that a mere dismissal of the complaint leaves the case to be determined upon the counterclaim: *Maffett* v. *Thompson,* 32 Or. 546, 551 (52 Pac. 565, 53 Pac. 854); *Tokstad* v. *Daws,* 68 Or. 90 (136 Pac. 844). A counterclaim then, within the meaning of our Code, is in effect a suit prosecuted by the defendant against the plaintiff.

Turning now to the answer filed by the Pacific Live Stock Company, it will be seen that all the affirmative matter operates defensively while some of it serves not only as a defense but also as a counterclaim and to the extent that such new matter is treated as a counterclaim it would, if sustained by the evidence terminate in a decree granting affirmative relief to the company. But a judgment or decree cannot be rendered against the state unless there is an express statute permitting it: *People* v. *Miles,* 56 Cal. 401, 402; *People* v. *Dennison,* 84 N. Y. 272, 281; *State* v. *Arkansas Brick & Mfg. Co.,* 98 Ark. 125 (135 S. W. 843, 33 L. R. A. (N. S.) 376). In effect, the state asks that

it be decreed to be the owner of the land; and so, also,
to the extent that the answer is treated as a counter-
claim, assuming that a counterclaim is sufficiently
pleaded, the company asks that it be decreed to be the
owner of the land.   Stated in broad terms, a citizen
when sued by the state can plead whatever will operate
to defeat the claim of the state; but a pure counter-
claim cannot be pleaded and prosecuted to a decree or
judgment against the state unless the state has given
its consent to the rendition of an affirmative judgment
for money or an affirmative decree for relief against
the state, for the reason that the prosecution of the
counterclaim to an affirmative decree or judgment for
the defendant would be equivalent to prosecuting a
suit against the state: *Holmes* v. *State,* 100 Ala. 291,
294 (14 South. 51) ; *Industrial School* v. *Reynolds,* 143
Ala. 579 (42 South. 114) ; *People* v. *Miles,* 56 Cal. 401;
*State* v. *Gaines,* 46 La. Ann. 431 (15 South. 174) ; *State*
v. *Leckie,* 14 La. Ann. 636; *State* v. *Baltimore & Ohio
R. R. Co.,* 34 Md. 344, 374; *Auditor General* v. *Bay
County,* 106 Mich. 662 (64 N. W. 570) ; *Aplin* v. *Grand
Traverse County,* 73 Mich. 182 (41 N. W. 23, 16 Am.
St. Rep. 576) ; *People* v. *Corner,* 59 Hun, 299 (12 N. Y.
Supp. 936) (affirmed in 128 N. Y. 640, 29 N. E. 147) ;
*State* v. *Corbin & Stone,* 16 S. C. 533, 543; *Borden* v.
*Houston,* 2 Tex. 594; *Bates* v. *The Republic,* 2 Tex.
616.

In this jurisdiction the distinctions between actions
at law and suits in equity are preserved.   The term
"counterclaim" as defined by our Code includes not
only "recoupment" but also "setoff": Bliss on Code
Pleading (3 ed.), §§ 367, 370; *Krausse* v. *Greenfield,*
61 Or. 502, 508 (123 Pac. 392, Ann. Cas. 1914B, 115) ;
and it is possible that in an action at law a citizen can,
when sued by the state, plead a counterclaim amount-

ing to a setoff as well as a counterclaim amounting to a recoupment for the purpose of preventing the state from obtaining a judgment against him, although he cannot on the basis of that counterclaim secure an affirmative judgment against the state. However, it is not necessary to attempt to decide whether the citizen can plead what is technically known as a setoff against a money demand; nor need we endeavor to determine how far a setoff can be used, if available at all.

This is a suit in equity and if the litigation were between individuals the decree as to any given acre of land would either be wholly for the plaintiff or wholly for the defendant or possibly a dismissal and a denial of relief entirely. The court cannot grant the company affirmative relief unless that relief 'is based upon its counterclaim, assuming that the answer sufficiently pleads a counterclaim, and the defendant cannot plead such a counterclaim, unless the state has consented to the prosecution of a suit against it. The Constitution expressly provides that—

"Provision may be made by general law for bringing suit against the state, as to all liabilities originating after or existing at the time of the adoption of this Constitution": Article IV, Section 24.

If it be assumed that the answer contains a counterclaim and if it be further assumed that the assumed counterclaim embraces a "liability" within the meaning of the Constitution, nevertheless the legislature has not enacted any law permitting the prosecution of an action or suit against the state in its own courts; and hence if the state has consented at all it is only an implied consent derived from the fact that the state itself began a suit. Although the state cannot be sued without a law permitting such suit, yet no statute is necessary to enable the state to institute a suit: *State*

*ex rel.* v. *Duniway,* 63 Or. 555, 559 (128 Pac. 853); and
while it is true that the state, when it comes into court,
must in the main follow the same procedure which an
ordinary suitor is required to observe, nevertheless
this general statement is subject to the qualification
that there is at all times present the fundamental
principle that the state cannot be sued without its con-
sent: *State ex rel.* v. *Holgate,* 107 Minn. 71 (119 N. W.
792). Immunity from suit is a prerogative right of
the sovereign; Sections 182 and 410, L. O. L., are gen-
eral statutes which do not expressly name the state;
and before it can be said that the state has surrendered
its high prerogative it ought to be made expressly to
appear or at least by clear and necessary implication,
that the general statute relinquishes the prerogative:
*People* v. *Miles,* 56 Cal. 401; *People* v. *Dennison,* 84
N. Y. 272, 280; *State* v. *Arkansas Brick & Mfg. Co.,*
98 Ark. 125 (135 S. W. 843, 33 L. R. A. (N. S.) 376);
*Raymond* v. *State,* 54 Miss. 562 (28 Am. Rep. 382);
*Industrial School* v. *Reynolds,* 143 Ala. 579, 585 (42
South. 114); *State* v. *Baltimore & Ohio R. R. Co.,* 34
Md. 344, 374; *Chevallier's Admr.* v. *State,* 10 Tex. 315.
See, also, *State Land Board* v. *Lee,* 84 Or. 431, 434 (165
Pac. 372). Nor does the state abandon its sovereign
prerogative and impliedly consent to being sued when
it institutes a suit in its own behalf: *People* v. *Denni-
son,* 84 N. Y. 272, 282. In most of its important fea-
tures the case of *Moore* v. *Tate,* 87 Tenn. 725 (11 S. W.
935, 10 Am. St. Rep. 712), closely resembles the case
presented here; and the reasoning employed here and
the conclusion reached here completely harmonize with
the reasoning and conclusion reached in that prece-
dent.

The following adjudications give additional support
to the doctrine that an affirmatively operating judg-

ment or decree cannot be rendered against a state unless permission is expressly given by statute: *United States* v. *Eckford,* 6 Wall. 484 (18 L. Ed. 920); *De Groot* v. *United States,* 5 Wall. 419, 431 (18 L. Ed. 700); *Reeside* v. *Walker,* 11 How. 272 (13 L. Ed. 693); *United States* v. *Warren,* 12 Okl. 350 (71 Pac. 685).

This suit was commenced by the constituted authorities of the state and by analogy to the rule applied in *Beers* v. *Arkansas,* 20 How. 527 (15 L. Ed. 991), the same constituted authorities may withdraw the suit in the absence of a statute expressly naming the state or at least by necessary implication naming it as one of the parties who cannot be granted a voluntary judgment of nonsuit. The statute which prevents a voluntary judgment of nonsuit before trial or after a counterclaim has been pleaded does not expressly or by necessary implication name the state; and hence there is no statute denying to the court jurisdiction to dismiss this suit. The Constitution delegated to the legislature authority to consent to the prosecution of suits against the state and the very language of the organic act contemplates express legislation. The legislature has not expressly consented; the Governor and attorney general cannot by their act in bringing this suit impliedly do what the Constitution indicates shall, if done at all, be expressly done by its sole agents for that purpose, the lawmakers.

There are a few adjudications which in varying degrees differ from the conclusion expressed here; but as the writer reads them, those few adjudications fail to give full recognition to the controlling and all-pervading principle that lies at the very foundation of sovereignty.

Of course, if the state institutes a suit in equity and prosecutes it to a finality and the suit terminates in a

dismissal after a trial on the merits, the state, to the same extent as an individual, would be barred from maintaining a second suit.

The decree of dismissal should be affirmed.

BURNETT, J., Dissenting.—On April 14, 1914, the State of Oregon as plaintiff filed in the Circuit Court for Harney County its complaint whereby it sought to set aside some sales of state lands in sections 16 and 36, to which the defendant had acquired title by mesne conveyances, the ground for suit being to the effect that the original purchaser acquired title to the lands by means of false and fraudulent applications, the particulars of which are related in the complaint. The prayer was that the conveyances be set aside, that the lands be declared to be the property of the plaintiff and that the defendant Pacific Live Stock Company be required to convey the lands to the state. On May 2, 1914, the defendant demurred to the complaint on various grounds stated, among others, that the complaint does not state facts sufficient to constitute a cause of suit against the defendant. After an oral argument before the court on the issue of law thus involved, this demurrer was overruled on December 31, 1914. The defendant was allowed forty days within which to file its answer and on February 5, 1915, it did file an answer, denying all the allegations of fraud and setting up laches of the plaintiff, death of the defendant's grantors and predecessors in interest whereby it had become impossible to obtain their testimony in support of the defendant's title, and further alleged that it had acquired the property in good faith, for a valuable consideration and without any knowledge or information concerning any fraud in its original acquisition from the state. It further

stated that the defendant had been in possession of the property openly, notoriously, exclusively and uninterruptedly for more than ten years prior to May 22, 1903; that neither the State of Oregon nor its grantors had been seised or possessed of any of said premises within ten years prior to that date, and it also alleged that for more than ten years before May 22, 1903, and ever since that time the defendant has been in the open, notorious, exclusive and uninterrupted possession of the property and the whole thereof, claiming the same adversely to the plaintiff and to all the world, and possessing the same under a claim of right, without any interruption, whereby it had acquired title by prescription as against the State of Oregon.

The prayer appended to the answer reads thus:

''Wherefore said defendant prays that said plaintiff take nothing by its suit and that defendant recover its costs herein expended and have such other relief as may be meet in the premises.''

On April 6, 1915, the plaintiff filed its motion to make certain allegations in the answer more definite and certain, but this motion was overruled and thereafter on June 7, 1915, the plaintiff filed its reply. The case stood thus until September 11, 1918, when there was entered an order dated August 24, 1918, reading as follows:

''Now at this time this matter coming on the motion of George M. Brown, Attorney General, and J. O. Bailey, Assistant Attorney General, representing the State of Oregon, for an order dismissing the suit heretofore and in 1914, instituted by the State of Oregon against the Pacific Live Stock Company, and it appearing to the Court that no affirmative relief is asked by defendant in its answer,

"Now, therefore, it is ordered, that said suit be and the same is hereby dismissed without prejudice."

On September 23, 1918, the defendant moved the court to set aside and vacate its order of August 24, 1918, entered September 11th of that year, and the motion was heard and submitted on September 30, 1918, whereupon the Circuit Court entered the following order:

"In the above-entitled cause the plaintiff having moved the Court to dismiss the said suit without prejudice, and said motion having been granted, now, therefore, it is hereby adjudged that said suit be dismissed without prejudice and that defendant recover its costs of suit herein expended, taxed at $16.50."

From this last order the defendant appeals.

The following sections of Lord's Oregon Laws are here set down as affecting the matters involved:

"Section 410.    A decree dismissing a suit may be given against the plaintiff in any of the cases specified in subdivisions 1, 2, and 3 of Section 182, except the last clause of such subdivision 3.    Such decree is a determination of the suit, but shall not have the effect to bar another suit for the same cause, or any part thereof.

"Section 182.    A judgment of nonsuit may be given against the plaintiff as provided in this chapter,—

"1. On motion of the plaintiff, at any time before trial, unless a counterclaim has been pleaded as a defense;

"2. On motion of either party, upon the written consent of the other filed with the clerk;

"3. On motion of the defendant, when the action is called for trial, and the plaintiff fails to appear, or when after the trial has begun, and before the final submission of the cause, the plaintiff abandons it, or when upon the trial the plaintiff fails to prove a cause sufficient to be submitted to the jury.

"Section 109.   Issues arise upon the pleadings when a fact or conclusion of law is maintained by the one party and controverted by the other.   They are of two kinds,—

"1.   Of law; and,

"2.   Of fact.

"Section 110.   An issue of law arises upon a demurrer to the complaint, answer, or reply, or to some part thereof.

"Section 112.   Issues both of law and of fact may arise upon different parts of the pleadings in the same action.   In such cases the issues of law shall be first tried, unless the court otherwise direct:

"Section 113.   A trial is the judicial examination of the issues between the parties, whether they be issues of law or of fact."

In addition to the issues of law arising upon demurrer it may be stated that an issue of law arises also upon a motion for judgment on the pleadings, under Section 79, L. O. L., or for a judgment notwithstanding the verdict, under Section 202.   It is within the legislative power to make a definition of its own of any term used in its enactments.   The statute declares a trial to be a judicial examination of issues, whether they be of law or fact, and we are concluded by this definition.   We cannot invent one of our own or be bound by those of the lexicographers.   Hence, when the court in the exercise of its judicial function examined and decided the issue of law arising upon the demurrer to the complaint, there was a trial within the meaning of the statute.   The motion for voluntary nonsuit at any time after this trial was too late, because Section 182, made applicable to suits in equity by Section 410, says that it must be "at any time before trial," if the nonsuit is to be granted on the motion of the plaintiff.   The language used in this section does not make any distinction between the kinds of

trial, whether they be upon issues of law or of fact.
Whichever it be, it forecloses the right to take a volun-
tary nonsuit: *Hume* v. *Woodruff,* 26 Or. 373 (38 Pac.
191); *Ferguson* v. *Ingle,* 38 Or. 43 (62 Pac. 760).

Section 101, L. O. L., reads thus:

"After the decision upon a demurrer, if it be over-
ruled, and it appears that such demurrer was inter-
posed in good faith, the court may in its discretion
allow the party to plead over upon such terms as may
be proper. If the demurrer be sustained, the court
may in its discretion allow the party to amend the
pleading demurred to, upon such terms as may be
proper."

In *Alley* v. *Nott,* 111 U. S. 472 (28 L. Ed. 491, 4 Sup.
Ct. Rep. 495), the Supreme Court of the United States
had under consideration the question of whether a
cause could be removed from the courts of the State
of New York to the Federal Court. The federal stat-
ute in force at the time required that the petition for
removal should be filed "at or before the term at
which said cause could be first tried, and before the
trial thereof": Act Cong. March 3, 1875, c. 137, § 3,
18 Stat. 471. The Code of New York is substantially
like ours, including the provision that upon the deci-
sion of a demurrer the court in its discretion may allow
the party in fault to plead anew or amend on such
terms as may be just. The defendants had demurred
to the complaint and their demurrers were overruled.
They then appealed, but afterwards withdrew their
appeals and their demurrers, filed answers, and at this
stage of the litigation applied for the removal of the
suit to the Federal Court. Speaking of this situation
the Supreme Court of the United States, through Mr.
Chief Justice WAITE, used this language:

"A demurrer to a complaint because it does not
state facts sufficient to constitute a cause of action, is

equivalent to a general demurrer to a declaration at common law, and raises an issue which, when tried, will finally dispose of the case as stated in the complaint, on its merits, unless leave to amend or plead over is granted. The trial of such an issue is the trial of the cause as a cause, and not the settlement of a mere matter of form in proceeding. There can be no other trial except at the discretion of the court, and if a final judgment is entered on the demurrer, it will be a final determination of the rights of the parties which can be pleaded in bar to any other suit for the same cause of action. Under such circumstances, the trial of an issue raised by a demurrer which involves the merits of an action is, in our opinion, a trial of the action within the meaning of the act of March 3, 1875. * * The situation of the case at this time, for the purposes of removal, was precisely the same as it would be if the trial, instead of being on an issue of law involving the merits, had been on an issue of fact to the jury, and the court had, in its discretion, allowed a new trial after a verdict. We can hardly believe it would be claimed that a removal could be had in the last case and, in our opinion, it cannot in the first.''

In *Walker* v. *Maronda,* 15 N. D. 63 (106 N. W. 296), the statute affecting Justices' Courts provided that ''the court may at any time before trial, on motion, change the place of trial'' (Rev. Codes 1899, § 6652), in certain cases. Like ours, the Code of that state declared that—

''a trial is the judicial examination of the issues between the parties, whether they are issues of law or of fact'': Section 5419.

The Supreme Court there held that the hearing and determination of the issue of law raised by a demurrer to the complaint in a Justice's Court is a trial, so that it is too late after the decision on the demurrer for a party to apply for a change of venue.

An instructive, well-considered case is that of *Goldtree* v. *Spreckels,* 135 Cal. 666 (67 Pac. 1091), where it was held that where a complaint contains three alleged causes of action, and defendant demurs thereto, and the demurrer is sustained as to two of the cases and overruled as to the third, and defendant answers the third cause of action, and plaintiff dismisses as to it, and does not amend his complaint, there is a trial, and he cannot afterward dismiss the entire action but judgment may be rendered for defendants as to the issues raised by demurrer.

The case of *Warm Springs Irr. Dist.* v. *Pacific Live Stock Co.,* 89 Or. 19 (173 Pac. 265), was an instance in which plaintiff was proceeding in eminent domain to condemn certain realty belonging to the defendant. The latter had answered and claimed an attorney fee under the condemnation statute. This presented a question of fact and could be determined only at a trial of the fact, but the court permitted the plaintiff to dismiss its suit without prejudice. This, of course, forestalled a trial of the issue of fact and necessarily the court arrived at the conclusion that an attorney fee was not allowable. There was no trial whatever and no stage of the litigation at which an attorney fee could be allowed and hence the nonsuit was taken before trial. The case is not an authority for the doctrine that trial in any place mentioned in the Code means only the trial of an issue of fact. The language of Mr. Chief Justice WAITE in *Alley* v. *Nott,* 111 U. S. 472 (28 L. Ed. 491, 4 Sup. Ct. Rep. 495), disposes of the statement, not necessary for the decision of the Warm Springs Irr. District case, that hearing on a demurrer is merely incidental to the action. A general demurrer does, indeed, go to the merits of the case on a question of law. Neither can we be bound by the slovenly

practice that may have grown up in some parts of the state, that a demurrer can be interposed merely for the purpose of delay. The statute expressly makes the right to plead over or answer depend upon whether or not the demurrer was interposed in good faith. It is a condition upon which alone the court is authorized to grant the desired permission.

Reference to the original records on file in this court in *Currie* v. *Southern Pac. Co.*, 21 Or. 566 (28 Pac. 884), shows that the statement of *Currie* v. *Southern Pacific Co.*, found in 23 Or. 400 (31 Pac. 964), is not altogether accurate. In the latter opinion the case is stated as if the issues of law were all presented by motion, whereas in fact there were demurrers to the separate answers of the defendant in a Justice's Court. But, however that may be, the court held in substance in the second opinion that the effect of the reversal on appeal to this court was to return the cause to the Circuit Court for a trial *de novo*, putting the litigation into the same condition in the Circuit Court as if no judicial action had been taken. That this construction of the opinion in the Currie case is right is shown by this language of Mr. Chief Justice LORD:

"There had been a mistake, as this court held, but when the judgment was reversed and the cause remanded, it stood on the docket as though no proceedings had been had therein. It was there precisely for trial *de novo* as it came from the Justice's Court, and the plaintiff could either take a nonsuit or take the consequences of any further proceedings."

The true meaning of this language is that on account of erroneous ruling in the Circuit Court there had been not a trial, but a mistrial, and when this was set aside the case was left as if there had been no trial, so that upon the reasoning of Mr. Chief Justice LORD the case

is only an authority to the effect that there had been
no trial to prevent the taking of a nonsuit.   It is true
that *Hutchings* v. *Royal Bakery,* 60 Or. 48 (118 Pac.
185), ignores the fact that there had been a demurrer
heard and determined before the voluntary nonsuit
was permitted.   This is the only case in the decisions
of this court which apparently supports the doctrine
that a nonsuit can be taken after the trial involved in
the decision of a general demurrer.   It should be dis-
regarded as against the weight of authority, including
the express language of the Code.

It is argued that for the purposes of nonsuit, the
term ''trial'' must be restricted to the trial of an issue
of fact and it is urged that Sections 45 and 46, L. O. L.,
relating to the change of place of trial, uphold this
doctrine.   Changes of venue in actions at law usually
are made because the action was commenced in the
wrong county, or to subserve the convenience of par-
ties and witnesses or to avoid prejudice of the in-
habitants or of the trial judge : Section 45, L. O. L.   An
action must be at issue on a question of fact: Section
46; but the change of venue in a suit must be made
before the answer is filed: Section 397.   To change the
place of trial of an issue of fact does not make the
examination and decision of an issue of law any less
a trial.   The sections mentioned contain nothing in-
fringing upon or differentiating the definition of
''trial'' as found in Section 182, and Section 46 says
that the change of place of trial shall not be allowed
in any action, ''until after the cause is at issue on the
question of fact only.''   It certainly cannot be that
after the place of trial had been changed in any in-
stance a party would be precluded from moving the
court for a judgment on the pleadings or for a judg-
ment notwithstanding the verdict, both of which clearly

present issues of law which must be tried by the court. The place where it is conducted is not one of the elements of the definition of trial and the issue to be tried, whether of law or fact, may arise, especially in a suit, after the change of venue.

It is clear from the weight of authority, as well as from the express provision of the Code, that the hearing and decision of the court on a general demurrer constitute a trial. It remains to determine whether the state, as a voluntary litigant, is exempt from any of the rules of procedure which it has prescribed through the legislative department of the government. It is manifest that without its permission the state cannot be sued in any court, for this would be an infringement of its sovereignty. But there is a distinction to be drawn between the assertion of a claim against the state without its consent and the application in behalf of a defendant of the rules of procedure which the state itself has adopted. In the latter instance there is no impairment of the sovereignty of the state. It is only a recognition of the sovereign act of the state embodied in its legislation. Most of the cases cited by Mr. Justice HARRIS in support of his conclusion that this case must be determined without reference to whether or not there was a trial within the meaning of our Code, are instances where the consent of the state to be sued was withdrawn by subsequent legislation. For example, *State ex rel.* v. *Jumel,* 38 La. Ann. 337, depended upon the withdrawal of the right to sue the state by a new constitution and legislation in pursuance thereof. Before the adoption of this constitution and laws mentioned, there was a right to sue the state, but the court there held that the legislation in question took it away. In *Beers* v. *Arkansas,* 20 How. 527 (15 L. Ed. 991), the state had

allowed itself to be sued and an action was commenced on certain state bonds. While the litigation was pending the legislature passed a law requiring such bonds to be deposited in court under penalty of the dismissal of the action, and this was held to be a valid exercise of the legislative power amounting to a limitation upon the state's previous consent to be sued. In *State* v. *Bank of Tennessee,* 62 Tenn. (3 Baxt.) 395, the withdrawal of the state's consent to be sued was by legislative enactment. These cases do not hold that in the absence of further legislation is not bound by its own rules of procedure when it institutes an action or suit. They only teach what we will agree upon, that the state cannot be sued without its consent and that the legislative branch of the government may withdraw that consent.

In *United States* v. *Diamond Coal & Coke Co.* (C. C. A.), 254 Fed. 266, Judge SANBORN states the principle thus:

"The equitable claims of a nation or a state appeal to the conscience of a chancellor with the same, but with no greater or less force, than would those of a private citizen under like circumstances, and, barring the effect of mere delay, they are judicable in a court of chancery, to whose jurisdiction the nation or state voluntarily submits them, by every principle and rule of equity applicable to the rights of a private citizen under similar circumstances."

*State ex rel.* v. *Kennedy,* 60 Neb. 300 (83 N. W. 87), was a case of *quo warranto* between the appointees of the Governor of the state and those of the mayor for fire commissioners of the City of Omaha. The contention was that when the Governor's appointees were attacked it was in effect an action against the state. Speaking about this, quoting from the syllabus, the court said:

"When a state invokes the judgment of a court for any purpose, it lays aside its sovereignty and consents to be bound by the decision of the court, whether such decision be favorable or adverse. Courts possess a portion of the sovereign power; they are authorized by the constitution to decide between litigants; and the authority to decide implies always, power to make their judgments effective."

*State* v. *Cloudt* (Tex. Civ. App.), 84 S. W. 415, was an instance where the State of Texas sued the defendant for taxes on some land. He pleaded in bar a judgment in an action by the state against his predecessor in interest for taxes on the same land, which was settled by compromise, giving the state a judgment for half of its then claim. Here follows an excerpt from the opinion:

"When a state appears as a party to a suit, she voluntarily casts off the robes of her sovereignty, and stands before the bar of a court of her own creation in the same attitude as an individual litigant; and her rights are determined and fixed by the same principles of law and equity, and a judgment for or against her must be given the same effect as would have been given it had it been rendered in a case between private individuals."

In *King* v. *Harris,* 134 Ark. 337 (203 S. W. 847), the plaintiff, claiming as heir of S. S. Smith, deceased, brought ejectment against the occupant of the land in question, which was formerly owned by Smith. The state intervened and answered, setting up some escheat proceedings whereby it claimed the land. One of the defendants was a former administrator of Smith's estate. Another was tenant of the State of Arkansas under agreement with the prosecuting attorney. The trial court dismissed the action on the ground that

it was substantially one against the state. The opinion uses this language:

"The state has in effect become a party plaintiff [defendant] to this litigation, and the court should not thereafter have dismissed the complaint for the reason assigned; i. e., that it was a suit against the state. The state's sovereignty is in no manner involved in this litigation. At its own election and through its prosecuting attorney it became a party to private litigation, which involved the title to a tract of land which had been owned by appellant's ancestor at the time of the ancestor's death."

While in the case before it the court declined to review the escheat proceedings under which the state claimed, it held that as the claimant had challenged their regularity in opposition to the state's intervention he was entitled to a trial of the issue thus joined. As narrated in *Port Royal & A. Ry. Co.* v. *South Carolina* (C. C.), 60 Fed. 552, the State of South Carolina began a suit in its state court against the company. The cause was removed to the federal court, where the company filed its cross-bill. Service of process was made upon the attorney general of the state. On a motion to set aside the service and dismiss the cross-bill because it amounted to a suit against the state, the court said:

"A sovereign state cannot be forced into court against her consent; but a cross-bill presupposes that the plaintiff is already in court rightfully, and when the state comes into court of her own accord, and invokes its aid, 'she is, of course, bound by all the rules established for the administration of justice between individuals.' * * As by her own volition she is already in court, and as the cross-bill is but a part of the defense to her suit, ancillary to and dependent upon it, we hold that she has by her own act subjected herself to all the rules established for the administration

of justice between individuals, and must make her defense to this cross-bill.''

This case is cited with approval in *United States* v. *Devereux,* 90 Fed. 182 (32 C. C. A. 564). *United States* v. *Beebee* (C. C.), 17 Fed. 36, was a suit to set aside some land patents on the ground that they were obtained by fraud. The syllabus reads thus:

''Lapse of time may be a sufficient defense to a suit instituted in the name of the United States. When the government becomes a party to a suit in its courts, it is bound by the same principles that govern individuals. When the United States voluntarily appears in a court of justice, it at the same time voluntarily submits to the law, and places itself upon an equality with other litigants.''

*Brundage* v. *Knox,* 279 Ill. 450 (117 N. E. 123), was an instance where the plaintiff suing for the State of Illinois as its attorney general, charged the defendants with appropriating parts of the bed of Lake Michigan by erecting thereon certain structures. Knox filed a cross-bill claiming the land as an accretion to his upland and prayed that his title be quieted. The following is an extract from the syllabus:

''The constitutional provisions exempting the state from suit are substantially based on the doctrine of the common law and rest upon public policy, but where the state is the complainant a defendant will not be prevented from filing a cross-bill.''

In the course of its opinion the court quotes with approval from 26 Am. & Eng. Ency. Law (2 ed.), 492:

''A state, when it brings a suit against citizens or other parties, accepts all the conditions that affect ordinary suitors, except that no affirmative judgment, as for the payment of costs, can be had against it.''

In *State* v. *Moore,* 77 W. Va. 325 (87 S. E. 367), the State of West Virginia had sued for some land

claimed by the defendants. There were no costs or disbursements decreed against the defendants on appeal, but after the return of the cause to the Circuit Court that court rendered an additional judgment against them for costs and disbursements and they brought a bill of review to correct the judgment. Answering the contention that this was a suit against the state, the court said:

"It would be a strange doctrine, and one fraught with wonderful consequences, if in construing Section 35, of Article VI, of our Constitution, we were obliged to hold that where the state herself sues, and invokes the aid of her courts in maintaining her rights, a humble citizen thus haled into court can never have the errors in decrees in her favor corrected by bill of review or by appellate process."

In *Commonwealth* v. *Helm,* 163 Ky. 69 (173 S. W. 389), the court held:

"It may also be confidently affirmed that, when the commonwealth comes into court to prosecute a suit it occupies, in the absence of some controlling statute on the subject, the attitude of any other litigant, and is subject to the same rules of practice and procedure."

*Commonwealth* v. *Barker,* 126 Ky. 200 (103 S. W. 303), is authority for allowing a defendant to set up a counterclaim against the state's money demand, although he could not have sued the state upon it by an original suit.

The judiciary is a department of the government having dignity and sanction equal to that of any other branch of the government. It is bound by the rules of procedure established by legislation for the control of litigation before it. When the state, operating through its administrative or executive department, voluntarily appears in court seeking the aid of the judiciary for the enforcement of its proprietary rights,

it must be bound by the procedure prescribed for any other litigant. It cannot select part of that procedure and ignore the rest. Equal and exact justice requires that a court should treat all litigants alike under the same circumstances. It is not accurate to say that in such cases the state is bound merely "in the main" by the rules of procedure. Such a statement is not characterized by that precision which should be used in judicial utterances. Moreover, the declaration that "a judgment or decree cannot be rendered against the state unless there is an express statute permitting it," is too general in its scope. Having come into court and challenged the defendant to a trial of an issue, the state, like any other litigant, must submit to the decision of its judicial department and the defendant in common with the state is entitled to a determination of the issue which will be binding on both parties. To say without restriction or qualification that no judgment or decree can be rendered against the state unless there is an express statute permitting it, would be to assume that no matter what litigation the executive department might institute, there never could be a determination thereof which could be pleaded in bar against a subsequent suit for the same purpose. It would be to deny to the defendant the equal protection of the laws and subject it to the caprice of every succeeding state administration.

*People* v. *Miles,* 56 Cal. 401, was an action by the state on a building bond given by contractors who built the prison at Folsom. The court there indeed held that the defendant could not obtain an affirmative judgment against the state, but on rehearing held that a judgment should be directed for the defendant against the state to the effect that the "plaintiff has no cause of action against the defendants or either of

them," but without costs. In *United States* v. *War-ren,* 12 Okl. 350 (71 Pac. 685), it was held that when the United States sues, it waives exemption so far as to let in a setoff to the extent of its demand, but no further, and judgment was directed to the effect that the United States take nothing by its action. In the case of *The Siren,* 7 Wall. 152 (19 L. Ed. 129), Mr. Justice FIELD used this language:

"But although direct suits cannot be maintained against the United States, or against their property, yet, when the United States institute a suit, they waive their exemption so far as to allow a presentation by the defendant of setoffs, legal and equitable, to the extent of the demand made or property claimed, and when they proceed *in rem,* they open to consideration all claims and equities in regard to the property libeled. They then stand in such proceedings, with reference to the rights of the defendants or claimants, precisely as private suitors, except that they are exempt from costs and from affirmative relief against them, beyond the demand or property in controversy."

It is clear that there was a trial on the general demurrer to the complaint; that the state, as it came voluntarily into court as a suitor, is bound by the rules of procedure which itself has prescribed, the same as any other litigant; that this is not an infringement of its sovereignty, but in obedience to its sovereign mandate as expressed in its laws; that when it institutes litigation against the defendant it is bound by its own rules, and it follows that the court may render a decision on the issues formed which will bind not only the defendant but also the state as a plaintiff, and finally, that since there has been a trial, the plaintiff, like any other litigant, was too late in its application for a voluntary nonsuit. To hold otherwise would be to give to the administrative department the authority to

withdraw the consent of the state at pleasure either partially or wholly without reference to the statute which governs all alike and without reference to its being a legislative question. It is not within the election of the administrative department to claim the benefits of part of the procedure established by the Code and reject the remainder, for the law of the land binds all departments of the state and all litigants alike. If the state as a suitor may ignore part of its own procedure it may ignore it all and seize any realty to which it had title at any time either by administrative action or by the declaration of martial law, suspending civil process.

For these reasons, I dissent from the conclusion reached by Mr. Justice BENNETT respecting the question of trial and its prevention of a voluntary nonsuit and from the statement of Mr. Justice HARRIS that the state is bound only in the main by the rules of procedure and that an express statute is required to support a judgment or decree against the state.

The state, like any other litigant, ought to be compelled to try its cause on the merits without unreasonable delay and not be allowed to split its cause of suit, urging part and holding back the rest as a menace to the defendant.

MR. JUSTICE BENSON concurs in this dissent.